**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| In re: § | | Chapter 11 |
| § | | |
| **STEWARD HEALTH CARE** § | | **Case No. 24-90213 (CML)** |
| **SYSTEM LLC,** *et al.*, § | | |
| § | | |
| Debtors.[1] § | | **(Jointly Administered)** |
| § | | |
| § | | |
| **MARK KRONFELD AS TRUSTEE** § | | |
| **OF THE SHC CREDITOR** § | | |
| **LITIGATION TRUST,** § | | |
| § | | |
| **Plaintiff,** § | | |
| § | | |
| v. § | | Adv. No. _____ |
| § | | |
| **AETNA HEALTH, INC. AND AETNA** § | | |
| **U.S. HEALTHCARE, INC.,** § | | |
| § | | |
| **Defendants.** § | | |
| § | | |

### ADVERSARY COMPLAINT

Mark Kronfeld (the "**Trustee**" or "**Plaintiff**") as Trustee of the SHC Creditor

Litigation Trust (the "**Trust**"), by and through his undersigned attorneys, files this

adversary proceeding pursuant to Rules 3007(b) and 7001 of the Federal Rules of

Bankruptcy Procedure (the "**Bankruptcy Rules**") against Aetna Health, Inc., Aetna

U.S. Healthcare, Inc., and their affiliates (collectively, "Aetna") and alleges as follows:

---

[1] A complete list of the Debtors in these chapter 11 cases may be obtained on the website of the Debtors'
claims and noticing agent at https://restructuring.ra.kroll.com/Steward. The Debtors' service address
for these chapter 11 cases is 2811 McKinney Avenue, Suite 300, Dallas, Texas 75204.

## NATURE OF THIS ACTION

1. Thirteen months ago, counsel for the Trustee sent Aetna a notice of dispute demanding payment of wrongfully underpaid and denied medical bills that had accrued since 2021. One month later, at Aetna's request, the Trustee provided Aetna an itemized inventory of the medical bills at issue. When Aetna never finished its "review" of this inventory, on June 27, 2025, the Trustee commenced arbitration against Aetna before the American Arbitration Association ("**AAA**"). The Trustee understood that the purpose of arbitration "is to achieve 'streamlined proceedings and expeditious results." *Preston v. Ferrer*, 552 U.S. 346, 357 (2008).

2. Instead of the "streamlined proceedings" it expected, months passed. Aetna caused the rank-and-strike process to select a single arbitrator to take fifteen weeks, after Aetna forced multiple rounds of rankings—ultimately requiring the AAA to impose a strike limit. When the AAA finally identified a mutually acceptable arbitrator, Mr. Charles Sartain (the "Arbitrator"), Aetna forced nearly three months of delay before a scheduling hearing took place on March 20, 2026—***thirty-eight weeks*** after the Trustee filed his demand for arbitration.

3. But the delays were just beginning. During the scheduling hearing, Aetna insisted it needed extensive time to bring the case to hearing because it was in the dark about what claims were at issue – despite having received the claim list a full year prior. When the Trustee's counsel explained that they had already provided the list, had been diligently pursuing the case, and were willing to take any measures needed to conclude the arbitration before June 15, 2027 (such as holding the trial on weekends), Aetna's counsel met the Trustee with a curt response: "***Get in line!***"

4.      The "line" Aetna's counsel referred to runs from now through September of 2027, and it exists because Aetna routinely underpays healthcare providers and is now using the multitude of arbitrations it faces to manufacture a bottleneck to lengthen the process for providers to recover what they are legally owed.[2] But the Trustee has been "*in line*" to recover against Aetna since February 19, 2025, when he sent his dispute notice; since March 28, 2025, when he provided Aetna's in-house counsel with a claims list (the one which Aetna represented it was "in the process of reviewing," yet was clueless about during the scheduling conference); since June 27, 2025, when he initiated formal dispute resolution before the AAA; and since August 20, 2025, when the arbitrator selection process began.

5.      All told from when the dispute resolution process began, and despite his good faith efforts, the Trustee waited in line for ***thirteen months*** just to get to the March 20, 2026 initial scheduling conference, where Aetna represented that it had no availability for a hearing date prior to September of 2027.[3] The Trustee was told

---

[2] There is ample evidence to support the fact that health plans, facing grievances from hundreds of different healthcare providers, are increasingly forcing these providers to queue in arbitration forums. In its 2025 Infographic detailing "Healthcare Dispute Resolution" (attached hereto as **Exhibit A**), the AAA reported that 1,047 healthcare cases were filed in 2025—***up 69% from that figure just five years ago***. More cases are being filed than are being resolved because health plans like Aetna have taken advantage of this oft-contractually required forum to manufacture delay and add cost to providers (in other words, the very antithesis of arbitration). This "***get in line***" approach to dispute resolution crafted by health plans like Aetna are, unfortunately, the experience of healthcare providers throughout the country. These plans aim to succeed by attrition, knowing they are failing to honor contractual commitments but banking on fact that many providers cannot devote the administrative time or financial resources to endure years of litigation (pushing some, as in Steward's case, to financial distress).

[3] Aside from creating a bottleneck in ADR forums, Aetna (and other plans) intentionally backlog themselves by funneling these disputes through the same subset of law firms. Aetna's incentive is *not* to retain more counsel to bring the cases to an efficient resolution, but is to ensure that its calendar remains full (consecutively for the next 75 weeks, apparently), so that every new provider that seeks to bring a claim must "***get in line***."

he would have to wait in line *eighteen months* longer to present his case, ensuring it would be close to 2028 before any funds may be paid to the Trust and directly jeopardizing the Plan becoming effective.[4]

6. The Trustee's duties do not permit him to wait in Aetna's line—one manufactured by the nation's second-largest health insurer to be an extension of its dilatory claim adjudication procedures as opposed to legitimate dispute resolution—to recover the $6.36 million owed from Aetna under its Hospital Services Agreement (the "**Agreement**") with Steward Health Care System LLC ("**Steward**"). This is especially true where this Court is an equally available and more expeditious forum. Instead of providing for the exclusive arbitration of claims between the parties, the Agreement states that a party may "pursue any other legal remedies available," that arbitration is "non-binding," and that participation in arbitration "shall not cause" the hospital to "lose any other legal right." Agreement, Section 8.3.1.

7. Thus, the Trustee seeks to exercise the "legal remedies available" to him in this forum and pursue the claims of the nine Massachusetts-based Hospitals[5]

---

[4] Over the Trustee's objection, the Arbitrator agreed with Aetna and set the final hearing for September of 2027. In addition, during the scheduling conference Aetna's counsel pointed to the six Adversary Proceedings recently filed by the Trustee in this Court as support for the September 2027 hearing date and as a reason to ignore the June 15, 2027 backstop. Aetna suggested that this Court could "never" resolve those cases before June of 2027. The Trustee disagrees. Contemporaneous with this Adversary Proceeding, the Trustee has filed a motion to stay the AAA arbitration proceeding pending the resolution of this case. The Trustee remains committed to pursuing relief in the most expeditious forum.

[5] Steward and its represented providers Good Samaritan Medical Center, Inc. ("**Good Samaritan Medical Center**"), Steward Holy Family Hospital, Inc. ("**Holy Family Hospital**"), Morton Hospital, A Steward Family Hospital, Inc. ("**Morton Hospital**"), Nashoba Valley Medical Center, A Steward Family Hospital, Inc. ("**Nashoba Valley Medical Center**"), Steward Norwood Hospital, Inc. ("**Norwood Hospital**"), Steward Carney Hospital, Inc. ("**Carney Hospital**"), Steward Saint Anne's Hospital Corporation ("**Saint Anne's Hospital**"), Steward St. Elizabeth's Medical Center of Boston, Inc. ("**St. Elizabeth's Medical Center**"), and New England Sinai Hospital, A Steward Family

formerly owned and operated by Steward, to whom – by the time Steward was forced to close its doors due to financial constraints – Aetna owed at least $6.36 million under their Agreement. Aetna's continuous, systematic, and wrongful denial of reimbursements to the Hospitals under the Agreement directly exacerbated the collapse of the nation's largest private healthcare system, to the detriment of thousands of employees and millions of patients. Specifically, the Trustee has identified no fewer than *1,393* medical claims for services where there is no dispute Aetna's members received care, but Aetna knowingly failed to pay.

8.      With the Hospitals doomed to bankruptcy, Aetna adds insult to injury by asserting proofs of claim *against* Steward in the Chapter 11 Cases (defined below), all the while seeking to keep its $6.36 million windfall. The Trustee seeks to require Aetna to comply with its commitments under the Agreement, instead of saddling Steward's creditors with that cost. Indeed, a small random sample set forth below from the hundreds of healthcare claims that Aetna refused to pay or underpaid reveals the extent of Aetna's wrongful and shamelessly greedy behavior:

- For a claim with dates of service from July 15–16, 2021, Aetna originally paid one of the Hospitals correctly. But then *three years later*, Aetna downgraded the DRG and recouped its payment. The Hospital appealed, and Aetna overturned the DRG downgrade. However, Aetna was unable to pull the original claim and instructed the Hospital to send a letter to re-open the case. When the Hospital did as instructed, Aetna rejected it because the claim was too old. Aetna never paid the claim.

- For a claim with dates of service from May 21, 2022 to June 7, 2022, one of the Hospitals obtained authorization for the patient's inpatient stay and billed Aetna. Aetna denied the claim for lack of medical necessity

_____

Hospital, Inc. (**"New England Sinai Hospital"**) (collectively, the "**Hospitals**"). Nashoba Valley Medical Center and Carney Hospital permanently closed on August 31, 2024.

for the inpatient level of care. The Hospital appealed, and Aetna overturned its denial. Despite that, Aetna never made any payment. The Hospital repeatedly followed up, and Aetna claimed it was sent for reprocessing multiple times. Nevertheless, Aetna never paid the claim.

- For a claim with date of service of August 24, 2023, one of the Hospitals obtained prior authorization for the service. After treating the patient consistent with the prior authorization, the Hospital billed Aetna $16,209.07, which Aetna paid. Four months later, Aetna used a review from a third-party vendor (Cotiviti) to assert that observation setting was appropriate and that the claim had been overpaid. The Hospital appealed with supporting medical records, but Aetna upheld the denial and Aetna retracted its payment.

These are just three examples readily identified by the Trustee, and there remain *1,390* more that this action seeks to redress.

9.     As further detailed below, Aetna's unlawful practices include (but are certainly not limited to): (a) failing to pay for valid inpatient claims on the basis that the patient's condition did not meet inpatient criteria where the patient's condition in fact met inpatient criteria; (b) failing to pay valid inpatient medical bills at the applicable inpatient rate, and instead erroneously reimbursing them at an outpatient or observation rate; (c) improperly downgrading the Diagnosis-Related Group ("**DRG**") assigned at the time of claim submission to a lower-weighted DRG, despite evidence supporting the DRGs as originally billed; (d) improperly downgrading the Evaluation and Management ("**E/M**") visit level assigned at the time of claim submission to a lower visit level, despite evidence supporting the E/Ms as originally billed; (e) underpaying and/or denying payment for medically necessary care provided to patients; and (f) failing to reimburse for medically necessary care due to administrative issues arising (through no fault of the Hospitals) in the process of

6

verifying coverage, seeking authorization, and billing and coding claims without valid reasons for withholding or reducing reimbursement.

## JURISDICTION AND VENUE

10.     The United States Bankruptcy Court for the Southern District of Texas (the "**Bankruptcy Court**" or the "**Court**") has jurisdiction over this adversary proceeding under 28 U.S.C. §§ 157 and 1334 and the *Order of Reference to Bankruptcy Judges*, General Order 2012- 6 (S.D. Tex. May 24, 2012) (Hinojosa, C.J.).

11.     Aetna has consented to the jurisdiction of this Court by filing Proof of Claim Nos. 6378, 6380, 6511, 6726, 6757, 6765, 6771, 6790, 6796, 6798, 7075, 7196, 7198, 7202, 7203, 7205, 7207, 7234, 7881, 8091, 8252, 8570, 8573, 8584, 8586, 8594, 8733, 8735, 8743, 8764, 8766, 8767, 8771, 8772, 8776, 8781, 8787, 8800, 8805, 8810, 8813, 8818, 8819, 8820, 8871, 8872, 8873, 8874, 8885, and 8943 (the **"Proofs of Claim"**) in the aggregate amount of approximately $5,698,077.98.[6]

12.     This adversary proceeding contains core claims under 28 U.S.C. § 157(b)(2), and this Court has jurisdiction to hear and to determine and enter a final order and judgment over such claims. This Court also has non-core concurrent jurisdiction under 28 U.S.C. § 1334 because the relief sought relates to the Debtors' bankruptcy cases and will have a material impact on the administration of the Debtors' estates and the Chapter 11 Plan. The Court has subject matter jurisdiction to consider this matter pursuant to 28 U.S.C. § 1334(b).

---

[6] The Trustee reserves all rights to raise additional objections to the Proofs of Claims on any basis.

13. An actual and justiciable controversy exists between and among the parties concerning payment from Aetna for the healthcare services rendered by the Hospitals to Aetna members.

14. The Court has personal jurisdiction over Aetna pursuant to Bankruptcy Rule 7004 and by virtue of Aetna consenting to the Court's jurisdiction by filing the Proofs of Claim.

15. Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

16. Pursuant to Rule 7008 of the Bankruptcy Rules and Rule 7008-1 of the Bankruptcy Local Rules for the Southern District of Texas, the Plaintiff consents to the entry of final orders or judgment by this Court in connection with this adversary proceeding if it is determined that, absent consent of the parties, the Court cannot enter final orders or judgments consistent with Article III of the United States Constitution.

### PARTIES

17. On May 6, 2024, Steward and its affiliated debtors each filed a voluntary petition for relief under chapter 11 of title 11 of the United States Code (the "**Bankruptcy Code**"). *See generally In re Steward Health Care System LLC, et al.*, Case No. 24-90213 (CML) (Bankr. S.D. Tex.) (collectively, the "**Chapter 11 Cases**"). The bankruptcy proceedings are ongoing.

18. On June 2, 2025, this Court issued an order transferring all litigation claims against commercial payors of Steward and affiliated debtors, including the Hospitals, to a litigation trust, with an effective date of July 17, 2025 [Docket No. 5035; Ex. A at 11]. The order named Mark Kronfeld to "serve as the person

responsible for the governance and administration of the Trust." *Id.* at 15. As such, and as of the date of this Complaint, all litigation claims belonging to Steward and/or the Hospitals now belong to a single entity—the Trust. Having filed the Proofs of Claim, Aetna was on notice of the transfer of these claims and did not object to such transfer.

19.     Aetna is the plan administrator, claims administrator, and/or insurer for the health plans and insurance policies at issue in this action. Upon information and belief, Aetna controls administration of the plans, decides whether to pay or deny medical claims submitted to the plans, and decides the level of reimbursement to pay to healthcare providers.

## BACKGROUND

20.     At all relevant times there has been a written agreement between Aetna and the Hospitals, which is referred to herein as the "Agreement."

### a. *Aetna's Underpayments*

21.     On January 1, 2019, Aetna and the Hospitals entered into the Agreement.

22.     Under the Agreement, the Hospitals provided a wide range of healthcare services to Aetna members and covered dependents. Pursuant to the Agreement, the Hospitals submitted claims to Aetna for reimbursement of those healthcare services, and Aetna was required to reimburse the Hospitals for those claims pursuant to the terms of the Agreement.

23.     Through the Agreement, the Hospitals agreed to accept payment from Aetna at discounted rates from the Hospitals' otherwise applicable billed charges in

exchange for, among other things, the assurance that Aetna would timely and appropriately compensate the Hospitals in accordance with the Agreement for services rendered to Aetna members.

24.     Aetna has repeatedly failed to honor its obligations to properly pay the Hospitals pursuant to the Agreement, which has caused the Hospitals damages.

*Timely Filing / Additional Information Requested Denials*

25.     A primary category of underpayments results from Aetna's failure to pay for medically necessary care due to administrative or technical issues arising in the process of verifying coverage, seeking prior authorization, and billing and coding claims. The denials for this category of underpayments do not appear to be based on any evident clinical determinations. Upon information and belief, these denials stem from instances where an Aetna member received care at an emergency room operated by one of the Hospitals but refused to provide insurance information, and so the Hospitals could not submit a claim at the time of service. Once the Hospitals discovered the patient's coverage with Aetna and submitted the claim, Aetna denied the claim as untimely.

26.     In a similar vein, Aetna would often assert that, even for timely claims, it could deny the claim for untimely filing because certain documentation was not received. This has occurred even where the Hospitals can demonstrate that itemized bills and complete medical records were submitted on time, often through certified mail. In many cases, these denials reflect breakdowns in Aetna's own claims intake and processing systems rather than any failure on the Hospitals' part.

27.     This category also represents instances where Aetna asserts that it did not provide authorization for a given service, even where the service was medically necessary and covered under the terms of the Agreement. Much of the time, this prior authorization was either not required (for instance, for emergency services), was actually obtained, or was not possible under the circumstances, and therefore Aetna should pay for the medical services rendered.

*Medical Necessity Denials*

28.     Aetna wrongfully failed to pay or underpaid claims by unilaterally and improperly deeming the medical care provided by the Hospitals as non-medically necessary or justified. Aetna's failure to pay the claims at issue on medical necessity grounds was not based on any appropriate standard of medical necessity.

29.     This category also involves denials of claims that Aetna unilaterally and improperly deemed inappropriate for payment on an inpatient basis so that Aetna could pay less for the Hospitals' services, knowing full well how time-consuming and expensive it is for the Hospitals to challenge these bureaucratic types of denials and underpayments. The Agreement provides for payment of different amounts depending on whether the patient is in "inpatient" status or "observation" status at the hospital. The Hospitals' services at issue were medically necessary at the status ordered and deemed appropriate by the treating physicians. Rather than adhering to the Agreement and paying the Hospitals for inpatient hospital care, Aetna employed aggressive utilization review tactics that resulted in inappropriate overuse of the lower-paying observation patient status category.

11

*Downcoding Underpayments*

30.     Another category of underpaid claims results from Aetna's systematic downgrading of the diagnosis on claims that the Hospitals submitted for payment ("**DRG Downgrades**"). The Hospitals submitted claims for payment with the properly coded DRG corresponding to the medically necessary services provided to Aetna members. DRGs categorize patients based on diagnosis, treatment, and length of stay. The DRG reimbursement system is used to determine payments for inpatient hospital stays, and hospitals are paid a predetermined amount based on the DRG. Aetna downgraded properly coded DRGs, which means it unilaterally (and gratuitously) determined that the DRG that was originally billed was not supported.

31.     This category includes underpaid claims resulting from Aetna's improper downgrading of the E/M visit level assigned at the time of claim submission to a lower visit level, despite evidence supporting the E/Ms as originally billed ("**E/M Downgrades**"). E/M visit levels categorize emergency department services based on the level of resource utilization. The Hospitals submitted claims for payment with the properly coded E/M visit levels corresponding to the medically necessary services provided to Aetna members. Upon information and belief, Aetna downgraded properly coded E/M bills, which means it unilaterally (and gratuitously) determined that the E/M that was originally billed was not supported.

32.     The DRG Downgrades and E/M Downgrades relate to cases that Aetna routinely downgraded, even though the services provided to Aetna members were properly coded using industry-accepted coding principles.

33. The categories of denials and underpayments described in this Complaint are not intended to be exhaustive. Aetna has given dozens of reasons for refusing to pay the amounts the parties agreed upon for services rendered in good faith to Aetna members.

34. Plaintiff exhausted all applicable internal appeals procedures and dispute resolution processes relating to Aetna's underpayments. In the alternative, Aetna waived any such requirements, and Plaintiff is excused from complying with those procedures.

### b. *Steward's Bankruptcy*

35. As discussed above, on May 6, 2024, Steward and its affiliated debtors commenced Chapter 11 cases in this Court. The Chapter 11 cases are jointly administered as case number 24-90213 (CML).

36. On June 2, 2025, this Court entered its *Order (I) Approving Settlement with FILO Secured Parties; (II) Authorizing and Directing Transfer of Assets in Connection Therewith; (III) Authorizing Amendment to FILO DIP Credit Agreement and Continued Use of Cash Collateral; (IV) Granting Adequate Protection; (V) Approving Assumption and Assignment Procedures and Form and Manner of Notice of Assumption and Assignment; and (VI) Granting Related Relief* [Docket No. 5035] (the "**FILO Settlement Order**"), which approved the Litigation Trust Agreement found at Docket No. 4966.

37. On July 25, 2025, this Court entered its *Finding of Facts, Conclusions of Law, and Order (I) Approving Disclosure Statement on a Final Basis and*

*(II) Confirming Joint Chapter 11 Plan of Liquidation of Steward Health Care System LLC and Its Affiliated Debtors* [Docket No. 5774] (the "**Confirmation Order**").

38.     Pursuant to the terms of the FILO Settlement Order, and as ratified by the Confirmation Order, on July 17, 2025 (the "**Trust Effective Date**"), the SHC Creditor Litigation Trust was established with Mr. Mark Kronfeld serving as the Trustee. Paragraph 6 of the FILO Settlement Order further provides that, on the Trust Effective Date, the claims and causes of action against Aetna and other commercial healthcare payors (the "**Trust Assets**" as defined in the FILO Settlement Order) were automatically transferred to the Trust. Under paragraph 11 of the FILO Settlement Order, the Trustee was authorized to prosecute the Trust Assets and otherwise act in accordance with the documentation establishing the Trust.

39.     Additionally, Paragraph 12 of the Confirmation Order provides that the claims and causes of action of the Hospitals vested in the Trust as of the Trust Effective Date. Accordingly, the Trustee now appears before this Court on behalf of the Trust to assert the claims under the Agreement which formerly belonged to the Hospitals against Aetna.

### c. *Procedural History*

40.     The parties' agreement sets forth various pro-forma procedures for dispute resolution, ultimately culminating in the option between AAA arbitration or public litigation:

> 8.2.2 Negotiation of Dispute Resolution. Once notice of dispute has been provided, the Parties shall attempt in good faith to promptly resolve the dispute within sixty (60) calendar days by negotiation and exchange of relevant information between authorized representatives of Company and Provider at the local market level. After all good faith attempts to

resolve the dispute have occurred, the dispute shall be elevated to Company's Regional Head and Provider's executive level to resolve the dispute. After all good faith attempts by Company's and Provider's executives have been exhausted, the Parties **may institute** arbitration as provided in Section 8.3 **or pursue any other legal remedies** available.

8.3.1 Submission of Claim or Controversy to Arbitration. Any controversy or claim arising out of or relating to this Agreement or the breach, termination, or validity thereof, except for temporary, preliminary, or permanent injunctive relief or any other form of equitable relief, **by mutual agreement** of the Parties **may** be settled by **non-binding** arbitration administered by the American Arbitration Association ("AAA") and conducted by a sole Arbitrator ("Arbitrator") in accordance with the AAA's Commercial Arbitration Rules ("Rules"). **Participation in Arbitration shall not cause PHO or Participating PHO Providers to lose any other legal rights**.

Agreement at §§ 8.2.2 – 8.3.1 (emphasis added).

The Trustee diligently pursued its claims under the dispute resolution provisions of the Agreement. On February 19, 2025, the Hospitals provided Aetna with a Notice of Dispute and Demand for Payment, outlining various categories of denials and underpayments at issue and requesting that Aetna resolve these improper denials and underpayments immediately. A true and correct copy of the Notice is attached hereto as **Exhibit B**. The Hospitals also provided Aetna with a claims list on March 28, 2025.

41.     Other than requesting the claims list, Aetna did not respond to the Notice of Dispute and so, after waiting the contractually required 60 days pursuant to the Agreement, on April 30, 2025, the Hospitals provided Aetna with a Notice of Escalation, attached hereto as **Exhibit C**. Aetna repeatedly delayed for months by claiming it needed additional time to review the claims list.

15

42. Therefore—and without ever receiving a response from Aetna that rose above "give us more time," the Hospitals filed a demand for arbitration with the AAA on June 27, 2025. Once non-binding arbitration was initiated, Aetna engaged in further delays, requiring three rounds of ranks and strikes before a single Arbitrator—Mr. Charles Sartain—was appointed. By the time the arbitrator was confirmed on February 2, 2026, a year had passed from the Hospitals' original February 2025 Demand letter.

43. As detailed above, at the first scheduling conference with the Arbitrator on March 20, 2026, the Arbitrator (though sympathetic to the bankruptcy constraints) declined to schedule the hearing in 2026 or the first half of 2027 due to Aetna's purported conflicts. Specifically, the Arbitrator conveyed to the parties after the hearing that:

> "In the scheduling order, if Claimant wants to protect its rights I would be amenable to a reference that **Claimant requested a hearing so that an award could be issued before June 14, 2027, and that request was denied.**"

March 20, 2026 Email from AAA attached hereto as **Exhibit D**.

44. The Hospitals seek a speedy and efficient process. Given that proceeding in the AAA forum guarantees, at best, resolution by the end of 2027, Claimant is exercising its right under the Agreement to pursue relief in an alternate forum.

45. Contemporaneously with this Complaint, the Trustee is requesting the Arbitrator and AAA to stay the AAA proceedings.

## COUNT I
## BREACH OF CONTRACT

46. Plaintiff incorporates by reference the allegations set forth above.

47. During the relevant period, the Hospitals were parties to the Agreement with Aetna, which was a valid and enforceable contract. Through the Agreement, the Hospitals agreed to accept payment from Aetna and its affiliates at rates discounted from their otherwise applicable billed charges in exchange for, among other things, the assurance that Aetna would timely and correctly compensate the Hospitals in accordance with the Agreement.

48. In particular, Section 4.1.2 of the Agreement details Aetna's obligations to pay for healthcare services provided to its members, providing that Aetna "agrees to: (a) pay Participating PHO Provider for Covered Services rendered to Members of Full Risk Plans, and (b) notify Plan Sponsors to forward payment to Company for payment to Participating PHO Providers for Covered Services." Agreement at § 4.1.2.

49. The Agreement, in turn, defines "Covered Services" as "[t]hose health care services for which a Member is entitled to receive coverage under the terms and conditions of a Plan rendered to a Plan Sponsor's Members by Participating PHO Providers." *Id.* at § 1.15.

50. As described above, Aetna breached the Agreement by improperly failing and refusing to pay for "Covered Services" provided by the Hospitals to Aetna's Members – services which the Members were entitled to, and did actually, receive.

51. The Hospitals have performed all the terms and conditions of the Agreement except to the extent the actions and omissions of Aetna have frustrated or excused such performance.

17

52.     As a direct and proximate result of Aetna's breach of the Agreement, Plaintiff is entitled to recover an amount to be proven at trial, but which is currently estimated to exceed approximately $6.36 million dollars, plus interest at the applicable rate, and all other relief as may be deemed just and proper.

**COUNT II**
**BREACH OF THE IMPLIED COVENANT**
**OF GOOD FAITH AND FAIR DEALING**

53.     Plaintiff incorporates by reference the allegations set forth above.

54.     Massachusetts law, the applicable law pursuant to the Agreement, implies into the Agreement a covenant of good faith and fair dealing so "that neither party to a contract 'shall do anything which will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract.'" *Suzuki v. Abiomed, Inc.*, 943 F.3d 555, 561 (1st Cir. 2019) (interpreting Massachusetts state law); *see id.* ("A breach of the covenant occurs when one party to a contract 'violates the reasonable expectations of the other.'").

55.     The implied covenant of good faith and fair dealing requires each party to the Agreement not to purposefully take actions that would unfairly prevent the other party from enjoying their rights under the contract or disappoint the other party's reasonable expectations. Taking advantage of Steward's financial constraints, Aetna continued to bleed the Hospitals dry on their road to bankruptcy. By denying and underpaying hundreds of valid claims under the Agreements, Aetna not only hastened the Hospitals' economic crippling but breached its duty to deal fairly and in good faith with the Hospitals by acting in a manner unfaithful to the purpose of the Agreements, which denied the Hospitals' expectations under the Agreement.

18

56.     The Hospitals reasonably expected Aetna to reimburse services provided to Aetna members in accordance with the Agreement, industry-wide standards, and other applicable guidance. Instead, Aetna systematically deprived the Hospitals of the benefit of the bargain by applying aggressive and unlawful utilization management practices that caused Aetna to inappropriately deny or underpay hundreds of valid claims submitted by the Hospitals over the course of years. *See, e.g.,* 90 Fed. Reg. 15792, 15845–47 (Apr. 15, 2025) (CMS cautioning that Medicare Advantage organizations engage in utilization management activities that distort the meaning of an organizational determination for their benefit).

57.     The Hospitals also reasonably expected Aetna to provide meaningful recourse to them if Aetna wrongfully denied or underpaid their valid claims. Instead, Aetna purported to require the Hospitals to undertake costly, time-consuming, inefficient, and futile efforts to appeal Aetna's wrongful denials and underpayments individually. Aetna routinely failed to process claims and appeals consistent with the parties' Agreement and industry standards.

58.     As a direct and proximate result of Aetna's breach of the implied covenant of good faith and fair dealing, Plaintiff is entitled to recover an amount to be proven at trial, plus interest at the applicable rate and attorney's fees and costs.

## COUNT III
## RELIEF FROM FORFEITURE

59.     Plaintiff incorporates by reference the allegations set forth above.

60.     The Hospitals are entitled to full and complete relief for Aetna's payment failures and underpayments. There is no dispute that the Hospitals

provided the clinical services associated with rendering the healthcare at issue to Aetna members.

61.     Aetna may contend that the Hospitals did not timely pursue some underpayments or denials or otherwise did not comply with each and every purported technical requirement or deadline pursuant to the Agreement, and that the Hospitals should be made to forfeit their right to payment for certain claims.

62.     However, to the extent that the Hospitals did not comply with any applicable technical requirements or deadlines, to allow Aetna to avoid having to properly reimburse payment would constitute an unlawful forfeiture, from which the Hospitals can, and should, be relieved. *See Howard D. Johnson Co. v. Madigan*, 361 Mass. 454, 456, 280 N.E.2d 689 (1972) ("In our decisions we have followed the rule that equity does not favor a forfeiture."); *Granfinanciera, S.A. v. Nordberg*, 492 U.S. 33, 57 (1989) ("[B]ankruptcy courts are essentially courts of equity.") (internal quotation omitted).

63.     Any purported failure by the Hospitals to comply with technical requirements or deadlines was not due to gross negligence, nor willful or fraudulent breach of duty. Moreover, Aetna did not suffer any detriment because of any alleged failure by the Hospitals to meet any alleged technical requirements or deadlines. On the contrary, Aetna benefited from any purported failure by the Hospitals to comply with technical requirements or deadlines because Aetna was able to maintain and use the funds that would otherwise have been paid to the Hospitals.

## COUNT IV
## TURNOVER OF ESTATE PROPERTY UNDER 11 U.S.C. § 542

64.     Plaintiff incorporates by reference the allegations set forth above.

65.     The amounts due and owing from Aetna to the Hospitals under the Agreement for covered healthcare services provided to Aetna members constitute property of the estate under 11 U.S.C. § 541 because they were legal or equitable interests of the Debtors in property as of the commencement of the Debtors' bankruptcy cases.

66.     Pursuant to 11 U.S.C. § 542(a), an entity in possession, custody, or control of property that the trustee may use, sell, or lease under 11 U.S.C. § 363 shall deliver to the trustee, and account for, such property or the value of such property, unless such property is of inconsequential value or benefit to the estate.

67.     Pursuant to 11 U.S.C. § 542(b), an entity that owes a debt that is property of the estate and that is matured, payable on demand, or payable on order must pay such debt to the trustee, except to the extent that such debt may be subject to setoff under 11 U.S.C. § 553.

68.     Pursuant to the FILO Settlement Order and Litigation Trust Agreement, the Trustee was vested with the right to pursue all claims and causes of action of the Debtors against commercial payors.

69.     Aetna is an entity within the meaning of 11 U.S.C. § 101(15).

70.     Aetna is in possession, custody, or control of property of the estate by withholding amounts due and owing from Aetna to the Hospitals, which are debts

that are matured, payable on demand, or payable on order, and these amounts are not of inconsequential value or benefit to the estates of Steward and the Hospitals.

71.     Aetna was required—under the Agreement—to remit payment to the Hospitals within forty-five (45) days of the Hospitals' electronic submissions of the bills to Aetna, which Aetna failed to do.

72.     Thus, Aetna must turn over to Plaintiff all estate property in its possession, which amounts to no less than $6.36 million.

## COUNT V
## DISALLOWANCE OF CLAIMS UNDER 11 U.S.C. § 502(d)

73.     Plaintiff incorporates by reference the allegations set forth above.

74.     Aetna filed the Proofs of Claim asserting aggregate claims totaling approximately $5,698,077.98.

75.     Aetna is in possession, custody, or control of property of the estate, including not less than $6.36 million in unpaid amounts due and owing for healthcare services rendered by the Hospitals to Aetna's members pursuant to the Agreement.

76.     These amounts are recoverable as property of the estate under 11 U.S.C. § 542.

77.     Under 11 U.S.C. § 502(d), the Court shall disallow any claim of any entity from which property is recoverable under 11 U.S.C. § 542, unless and until such entity has turned over such property to the estate.

78.     Aetna is an entity from which property is recoverable under 11 U.S.C. § 542, and Aetna has not turned over such property as required by the Bankruptcy Code.

22

79.     Accordingly, pursuant to 11 U.S.C. § 502(d), Aetna's claims must be disallowed in their entirety unless and until Aetna pays over to the Trust all property of the estate recoverable from Aetna, including all amounts determined to be due and owing under the Agreements.

**COUNT VI**
**DISALLOWANCE OF CLAIMS UNDER**
**BANKRUPTCY RULE 3001(c)(1)**

80.     Plaintiff incorporates by reference the allegations set forth above.

81.     Bankruptcy Rule 3001(c)(1) provides in pertinent part that, "[i]f a claim or interest in the debtor's property securing the claim is based on a writing, the creditor must file a copy with the proof of claim[.]"

82.     Aetna filed Proof of Claim Nos. 6378, 6380, 6511, 6726, 6757, 6765, 6771, 6790, 6796, 6798, 7075, 7196, 7198, 7202, 7203, 7205, 7207, 7234, 7881, 8091, 8252, 8570, 8573, 8584, 8586, 8594, 8733, 8735, 8743, 8764, 8766, 8767, 8771, 8772, 8776, 8781, 8787, 8800, 8805, 8810, 8813, 8818, 8819, 8820, 8871, 8872, 8873, 8874, 8885, and 8943 asserting aggregate claims totaling approximately $5,698,077.98.

83.     The Proofs of Claim fail to attach any agreements or documentation.

84.     Because the Proofs of Claim fail to attach any supporting documentation pursuant to which Aetna would be entitled to the Proofs of Claim, they fail to meet the requirements of Bankruptcy Rule 3001(c)(1) and should be disallowed.

**COUNT VII**
**DISALLOWANCE OF CLAIMS (NO LIABILITY CLAIMS)**

85.     Plaintiff incorporates by reference the allegations set forth above.

23

86. Aetna filed the Proofs of Claims asserting aggregate claims totaling approximately $5,698,077.98.

87. The Debtors' books and records indicate that the amounts sought in the Proofs of Claim are incorrect, and no amounts reflected in the Proofs of Claim are owed by any of the Debtors to Aetna.

88. Elimination of the Proofs of Claim will enable the estates to maintain a more accurate claims register and will not prejudice Aetna.

89. Accordingly, the Proofs of Claim should be disallowed.

## COUNT VIII

## DECLARATORY JUDGMENT

90. Plaintiff incorporates by reference the allegations set forth above.

91. As set forth above, the Trustee contemporaneously has moved to stay the AAA proceedings. Aetna is objecting to the Trustee's request to stay, asserting that the Agreement contains a mandatory arbitration clause and asking for immediate entry of a scheduling order that contains a September 2027 hearing date.

92. However, the arbitration clause at issue is explicitly "non-binding" and so Aetna cannot force the Trustee to remain in AAA arbitration.

93. As such, there is an actual controversy under 28 U.S.C. §2201 between the parties as to whether the Agreement's reference to arbitration is permissive or mandatory.

94. The Trustee respectfully requests that the Court declare that Section 8.3 of the Agreement is non-binding and confirm the Court's exercise of jurisdiction over this matter.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff respectfully requests that this Court:

A. Award Plaintiff compensatory damages and interest in an amount to be proven at trial;

B. Award Plaintiff costs and attorneys' fees incurred in this action;

C. Require Aetna to turn over all property of the estate in its possession to Plaintiff;

D. Disallow Aetna's Proofs of Claim until such time as all property of the estate in Aetna's possession is turned over to Plaintiff;

E. Disallow the Proofs of Claim in their entireties;

F. Declare that this Court has jurisdiction over the subject matter; and

G. Award Plaintiff such other and further relief as the Court deems just and proper.

Respectfully submitted, March 27, 2026.

KING & SPALDING LLP

*/s/ Hale Neilson*
Hale Neilson (TX Bar No. 24116820)
1100 Louisiana Street
Suite 4100
Houston, TX 77002-5213
713-751-3200
hneilson@kslaw.com

-and-

James W. Boswell (*pro hac vice*)
Thaddeus D. Wilson (*pro hac vice*)
Sarah L. Primrose (*pro hac vice*)
Jennifer S. Lewin (*pro hac vice forthcoming*)
K. Tyler Dysart (*pro hac vice forthcoming*)
1180 Peachtree Street, NE
Suite 1600
Atlanta, Georgia 30309
404-572-4600
jboswell@kslaw.com
thadwilson@kslaw.com
sprimrose@kslaw.com
jlewin@kslaw.com
tdysart@kslaw.com

-and-

Matthew Kelsey (*pro hac vice*)
Dana Berkowitz (*pro hac vice*)
1290 Avenue of the Americas
14th Floor
New York, NY 10104
212-556-2100
mkelsey@kslaw.com
dberkowitz@kslaw.com

*Attorneys for Plaintiff*

26